## MORSE v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. October 11, 1909. On Motion to Amend Mandate, November 23, 1909.)

No. 292.

1. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—CRIMINAL PROSECUTION OF OFFICER FOR MISAPPLICATION OF FUNDS—INSTRUCTIONS.

In a prosecution of an officer of a national bank under Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), for misapplication of funds with intent to injure and defraud the association, general language used in the charge in explaining the section, stating that a misapplication of funds, in order to constitute an offense, must have been with intent to injure or defraud the bank "or to deceive any officer of the bank or any agent appointed pursuant to law to examine the affairs of the bank," was not misleading, where the jury were subsequently charged specifically on the precise issue presented by the indictment and that an intent to defraud the bank must be shown.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 257.*]

2. CRIMINAL LAW (§ 1172*)—APPEAL AND ERROR—REVIEW—HARMLESS ERROR.

An error in an instruction applying to certain counts only of the indictment does not warrant a reversal, where there was a verdict of guilty also on other counts not affected by such instruction, which is sufficient to support the judgment.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3161; Dec. Dig. § 1172.*]

3. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—CRIMINAL RESPONSIBILITY OF OFFICERS—MAKING FALSE ENTRIES.

Upon a charge against an officer of a national bank of making false entries in the books of the bank, it is immaterial whether defendant made the entries in person or caused them to be made by a clerk or bookkeeper.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 960–962; Dec. Dig. § 256.*]

4. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—CRIMINAL RESPONSIBILITY OF OFFICERS—FALSE ENTRIES.

Entries in the books of a national bank showing loans to persons named on the security of stocks deposited as collateral, when in fact the transactions were purchases of the stock by the bank, the supposed borrowers being merely dummies wholly irresponsible for the amount of the notes which they gave without any intention of paying the same or any knowledge of the actual transactions, were false entries, and, when made by the direction of an officer of the bank who conducted the transactions, a jury was justified in finding that they were fraudulent and made with intent to deceive the bank examiner and his agents in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497).

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 960; Dec. Dig. § 256.*]

5. CRIMINAL LAW (§ 1159*)—APPEAL AND ERROR—REVIEW—CONCLUSIVENESS OF VERDICT.

Where the evidence was conflicting on an issue of fact in a criminal case, the finding of the jury thereon is conclusive on an appellate court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3076; Dec. Dig. § 1159.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—OFFENSES BY OFFICERS —FALSE REPORTS.

The fact that a national bank is prohibited by Rev. St. § 5201 (U. S. Comp. St. 1901, p. 3494), from purchasing its own stock, does not make such a purchase a nullity, nor does the purchase extinguish the stock, and, where a bank bought and held shares of its own stock, an entry in a report to the Comptroller of the bonds, securities, etc., held by the bank from which such stock was omitted, constituted a false entry.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 960, 961; Dec. Dig. § 256.*]

7. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—OFFENSES BY OFFICERS —FALSE REPORTS.

The fact that entries in a report made by a national bank to the Comptroller accurately state the facts as shown by the books does not prevent them from being false, where the books themselves do not correctly show the actual transactions or condition of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 961; Dec. Dig. § 256.*]

8. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—CRIMINAL RESPONSIBILITY OF OFFICERS—FALSE REPORTS.

Defendant, who was vice president of a national bank, caused stock of the bank to be purchased through brokers. The shares as bought were delivered to the bank and paid for by a cashier's check. On the same date defendant would cause his stenographer to give her unsecured note to the bank for a like amount. No loan was in fact made to her, but the stock was bought by the bank and retained by it, although the transactions did not so appear on the books, and when reports were made to the Comptroller the stock was not shown therein. Held, that although the reports were made by employés from the books, and the false entries in respect to the bank's securities therein were not expressly directed by defendant, he was chargeable therewith criminally under Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497).

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 962; Dec. Dig. § 256.*]

9. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—CRIMINAL PROSECUTION OF OFFICERS—INSTRUCTIONS.

In the prosecution of defendants, under Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), charged as officers with having made false entries in the books of a national bank and in reports to the Comptroller with intent to injure and defraud the bank and deceive its officers and the examiner, it was not error to charge the jury that, if they found that such false entries were made, they were authorized to presume therefrom, in the absence of any explanation, that defendants knew them to be false, and that, if the natural and probable consequence of such entries was to defraud or deceive, they might presume, in the absence of explanation, that such was defendant's intention.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 974; Dec. Dig. § 257.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

Charles W. Morse was convicted of offenses against the national banking law, and brings error. Affirmed.

See, also, 169 Fed. 1021, 94 C. C. A. 667.

On writ of error to review a judgment, entered upon the verdict of a jury, convicting the defendants Morse and Alfred H. Curtis, as vice president and president, respectively, of the National Bank of North America, of making false entries in the books and reports of the bank and of misapplication of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

its funds. Three indictments were filed against the defendants containing 84 counts. These indictments were consolidated by order of the court. Twenty-one counts were withdrawn by the district attorney or were dismissed by the court, leaving 63 counts to be considered by the jury. The consolidated indictment as printed in the record covers 231 pages. The jury convicted the defendants upon 53 counts, charging misapplication of the funds of the bank and the making of false entries in its books and reports to the Comptroller. Upon all of the conspiracy counts the defendants were acquitted.

Sentence was suspended as to the defendant Curtis. The defendant Morse was sentenced to imprisonment in the federal prison at Atlanta, Ga., for 15 years.

Martin W. Littleton and Owen N. Brown, for plaintiff in error.

Henry A. Wise, U. S. Atty. (Henry L. Stimson and Felix Frankfurter, of counsel).

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. It is urged that grave injustice was done the defendant Morse in requiring him to answer an indictment charging him with having committed 84 separate and distinct offenses.

The trial occupied 3 weeks, the court sitting from 10 o'clock until 5 each day, Saturdays included; so that, if the ordinary court hours had been observed the trial would have occupied 4½ weeks.

The questions considered required the examination of a large number of complicated banking and commercial transactions, necessitating the study of a vast array of figures and the understanding of the book-keeping and procedure incident to the business of national banks.

It is argued that a jury, with nothing but the memory of its members upon which to depend, cannot keep such a tremendous record of complicated facts in mind, and that its conclusion must inevitably be based upon vague general impression and conjecture. These considerations would be persuasive were they germane to the issue now before us. They should, however, be addressed to the legislative and not to the judicial branch of the government.

The statutes of the United States permit a multiplicity of counts, and the consolidation of indictments relating to the same general subject is within the discretion of the trial court.

It is asserted that it is for the interest of the accused that this should be done, that there is less hardship to him in meeting the charges at one trial than at a series of trials extending, perhaps, over a term of years.

It is possible that if the attention of the lawmakers were called to this subject they might, at least, limit the number of charges which an accused person is required to meet under section 5209, Rev. St. (U. S. Comp. St. 1901, p. 3497), as they have done under other sections of the Revised Statutes. If the jury experienced the same difficulty as this court in adapting the voluminous proof to the various charges, they must have found the task a most arduous and perplexing one. The fact that counsel have deemed it necessary to submit briefs aggregating 576 printed pages is a forcible reminder of the difficulties which must have beset the jury in its endeavor to comprehend such an array of complicated accusations.

That a jury is not a proper tribunal to pass intelligently upon such issues is recognized in civil causes.

To meet a multiplicity of charges depending upon technical knowledge requires the employment of experts and the outlay of large sums of money which, in the case of a poor man, might almost amount to a denial of justice. These considerations, if presented to Congress, may induce some action along the lines suggested; but as the law now stands there seems to be no limit to the number of counts which a person accused of violating the national bank act may be required to meet.

It is also asserted that the sentence of the defendant Morse to 15 years' imprisonment was excessive and unusual.

In view of the fact that sentence was suspended in the case of the defendant Curtis, who was president of the bank, there is much that may be said in support of this contention. These considerations, however, should be addressed to the President upon application for executive clemency. This court is not permitted to consider them.

The defendant insists that the trial court committed a fundamental error in submitting to the jury on the misapplication counts the intent to deceive which was not alleged in the indictment. Count 30 of the indictment—and all the misapplication counts are alike in this respect—alleges that the defendants "unlawfully, knowingly, and fraudulently, and with intent to injure and defraud the said National Banking Association, did willfully misapply certain of the moneys, funds, and credits of the said National Banking Association then and there being to the amount and value of $102,920." The allegation is plainly one charging the defendants with misapplication with intent to injure and defraud the bank, and the proof tended to establish the truth of the allegation, and not an intent "to deceive any officer of the association, or any agent appointed to examine the affairs of any such association."

After quoting and carefully explaining to the jury the applicable portions of section 5209 of the Revised Statutes, the court said:

"It is further necessary, to complete the crime of willful misapplication, not only that there should have been a conversion of money, funds, or credits to the use of some one other than the bank, but that such conversion should have been made with the intent on the part of the defendants to injure or defraud the bank or any other person, or to deceive any officer of the bank, or any agent appointed pursuant to law to examine the affairs of the bank."

Although this is a correct exposition of the law, it is urged by the defendant's counsel that in its application to the case in hand it was incorrect and misleading and may have induced the jury to believe that they were justified in convicting the defendant of misapplication of the funds of the bank if they found that his intent was to deceive an official of the bank or a bank examiner, even though they found him guiltless of the intent to defraud the bank as alleged in the indictment. The answer is:

First: The language criticised occurred in that part of the charge where the court was explaining the law generally to the jury, and any possible misapprehension on their part must have been removed by the clear and compendious explanation subsequently given by the court of the precise issue presented to them on the misapplication counts.

Second. Assuming error, it only affected the misapplication counts and will not warrant a reversal if the defendant was properly convicted on the counts charging false entries. Indeed, if the conviction can be upheld upon two of these counts, it is sufficient to sustain the judgment.

Third. No exception was taken to the charge in this regard, and no error is assigned predicated on this portion of the charge.

If we were satisfied that any substantial injustice had been done the defendant, if, for instance, we were convinced that he has been convicted of an offense not charged in the indictment, we would not hesitate to ignore the failure to note an exception. In criminal causes the court should be zealous to protect the rights of the defendant and should never permit a conviction to stand where there is a material variance between the allegation and the proof. It is most unlikely, however, that the jury were misled by the paragraph of the charge quoted above. As already pointed out, the court was explaining, generally, the meaning of the statute, and the language quoted was an absolutely correct statement of its provisions. Later, when dealing with the specific charges of misapplication, the court charged that the intent must be to injure or defraud the bank. For instance, in describing the crime of misapplication by means of an overdraft, he said:

"If the money was taken and permitted to be taken without authority or in excess of the authority lodged in Curtis and Morse, if it was taken with the prescribed intent to defraud or injure, then it was unlawfully taken."

There are other portions of the charge which tend strongly to support the contention that the jury could not have entertained the idea that intent to deceive an officer of the bank or an examiner was an ingredient of the offense of willful misapplication as charged in the indictment.

Pursuant to requests by the defendant's counsel, the court charged the specific proposition as to the nine counts numbered from 21 to 29, both inclusive:

"That the jury must acquit unless satisfied beyond a reasonable doubt that the acts of the defendant were done with intent to injure or defraud the said association for his own use, benefit, and advantage, or for the use, benefit, and advantage of some person or company other than the said bank."

These counts charged the misapplication of the funds of the bank by means of an overdraft. As to these counts, therefore, it would seem most unlikely that the jury could have been misled.

Per contra, we cannot wholly divest ourselves of the apprehension that the jury may have obtained a mistaken notion of the essentials of the offense and may possibly have convicted the defendant upon the theory that the funds of the bank were misapplied with intent to deceive an officer of the bank or an agent of the government, and not with intent to injure and defraud as alleged in the indictment.

In a civil cause a theory resting upon a foundation so insubstantial could not be maintained; but, where the liberty of a citizen is at stake, the court should be clearly convinced that he has not been convicted under a mistaken interpretation of the law. If the language above quoted were the only portion of the charge upon which the defendant's

argument is based, it would not be difficult to disregard it; but later on, when the court was explaining the misapplication counts relating to the Ice transactions, he charged, after stating that, if the jury believed that the Ice stock was purchased at grossly excessive prices, they might find that the amount paid in excess of the real values of said stock was a willful misapplication thereof, providing they also found "that such misapplication was with the intent denounced by the statute."

It would have been more accurate had he said, "with the intent charged in the indictment."

The intent denounced in the statute, as previously explained by the court, was (1) either to injure or defraud the bank, or (2) to deceive any officer of the bank or any agent appointed to examine its affairs.

Is it not possible that the jury may have convicted the defendant, upon the counts in question, of an intent not charged against him in the indictment?

The fact that no exception was reserved to this portion of the charge would, in a civil cause, ordinarily be a sufficient answer to the contention here asserted; but our rules permit us to consider "a plain error though not assigned," and in a criminal case such an error should not be ignored. Wiborg v. U. S., 163 U. S. 632, 659, 16 Sup. Ct. 1127, 41 L. Ed. 289; Crawford v. U. S., 212 U. S. 183, 194, 29 Sup. Ct. 260, 53 L. Ed. 465.

In view of this possible misunderstanding on the part of the jury, we pass to the consideration of what are known as the "False Entry, Ice Stock Counts." These are 3A, 4B, 7A, 8A, 9A, 3B, 4C, 6A, 9B, and 10A, all charging false entries in the books of the bank. Defendant was convicted on all these counts.

We see no escape from the proposition that, if the defendant were properly convicted upon two of these counts, the judgment must be sustained. Count 3B, for instance, charges:

That on December 8, 1905, the defendant, being vice president of the National Bank of North America, unlawfully, knowingly, and fraudulently did willfully make in a book of the bank known as "Call Loans," on page headed "No. 5188 Davison Brown," a certain entry, as follows:

"114712.83 6 Dec. 8, 1905, 4000 Am. Ice Secy. Com."

That this entry purported to show, and did in substance indicate and declare, that a loan in the amount of $114,712.83 had then and there been made by the bank to Davison Brown with 4,000 shares of the American Ice Company as security.

That said entry was false (1) because no loan in that amount or any amount had been made to Davison Brown by the bank, and (2) that the 4,000 shares of Ice stock had not been placed as security for such loan but were in fact the property of the bank.

That the false entry was made by the defendant with intent to injure and defraud the bank and its shareholders and creditors and to deceive the other officers of the bank and any agent appointed by the Comptroller of the Currency to examine the affairs of said bank.

This count will serve as an illustration of these charges of false entries. So far as they are concerned, the gist of the accusation against

the defendant is that, having obtained control of the bank, he entered upon a career of reckless and forbidden speculation, purchasing with the money of the bank securities of a fluctuating and doubtful value and concealing the transactions by entries in books and reports. It is contended that these entries indicated that the money so misapplied was loaned to third parties with the said securities as collateral; whereas, the alleged borrowers were, in truth, mere creatures of the defendant wholly under his influence and control and of no financial responsibility, their names being used merely as a cloak to cover the improper use of the bank's funds.

These charges are strenuously denied by the defendant. The issue thus raised is one of fact to be determined by the jury, and their verdict, unless clearly against the weight of evidence, cannot be disturbed by this court.

The broad fundamental questions underlying several of these counts were:

First. Who owned the Ice stock, the bank or Morse?

Second. If the bank owned it, was this fact concealed by false entries in the books and reports made by the direction or procurement of the defendant?

These propositions were clearly and fairly stated by the court, and the jury were repeatedly informed that the crucial question for them to determine was who owned the stock, and they were told again and again that, if they found that Morse was the real owner, he must be acquitted.

For instance, the court said:

"If you find that these shares of the American Ice Securities Company were not the property of the bank and were not owned by the bank, there is an end of the * * * false entry charges resting thereon."

The finding of the jury that the bank owned the stock carried with it, almost as matter of course, the other ingredients of the crime. It cannot be maintained that the entries were consistent with such ownership, and the jury were justified in finding not only that they were false, but were made with intent to conceal the true situation. So that the only question is whether there was any evidence to submit to the jury, for if there were it would have been error to have granted the motion for a direction of a verdict for the defendant.

A single example will serve to illustrate this branch of the controversy, as all the counts charging false entries of Ice stock relate to substantially similar transactions.

In December, 1905, one John F. Carroll purchased, through the defendant, 4,000 shares of the stock of the American Ice Company with money advanced by the Bank of North America at 28⅜. Four days afterwards (December 8th) the bank purchased this stock from Carroll at 33⅘, paid Carroll $20,707 as his profits, and canceled the loan. The bank then owned 4,000 shares of Ice, or, at least, the jury were justified in so finding.

Davison Brown was a clerk in the office of Primrose & Braun, note brokers, at a salary of $25 per week. Braun was the defendant's private secretary. Brown could not have paid a note to exceed $5,000

at the time in question. At the request of some one at the bank, Brown signed a promissory note for $135,420. He had no interest in the transaction, knew nothing about it, and did not expect to pay the note or any part thereof.

On December 8, 1905, the 4,000 shares of Ice appear on the books of the bank as collateral to a call loan made to Davison Brown on his note. On January 9, 1906, the same 4,000 shares were sold to Katherine T. Gelshennen at 40; $25,000 being paid by her to the defendant and by him to the bank. The profit of this sale was passed to the credit of the bank, the December loan to Davison Brown was canceled, and a new one entered. On the 15th of January Mrs. Gelshennen sold the stock at a profit of $13,855; 2,000 shares remaining with the bank. The stock was sold for 43½, $87,000 being the price paid for 2,000 shares, and the transaction appeared on the books as a loan to one Leslie E. Whiting with the shares as security. Whiting was also a clerk of Primrose & Braun, receiving a salary of $12 a week and was but 19 years of age. He knew nothing about the transactions in which he was asked to sign notes at the bank and concededly, upon his own testimony, was acting as a dummy with no knowledge of or interest in the loans made in his name.

From January 11, 1906, to April 18, 1907, the books show seven similar transactions in which loans appear as made to Whiting on his notes with Ice and Copper stock as collateral. In form these transactions were undoubtedly entered as loans; but the jury may fairly have found that in substance and in fact the bank was the actual purchaser of the stock, and that the entry in the names of the irresponsible clerks who knew nothing of the merits of the transactions, was merely a subterfuge to prevent the Comptroller and his agents from learning that the bank was engaged in speculating in fluctuating stock.

If loans, why was no interest charged the borrower? Upon what theory was the lender entitled to dividends earned by the collaterals? Why should profits made on sales of the collaterals be given to the bank? Upon the hypothesis of ownership the bank was entitled to the dividends and profits of sales which it received, but upon the theory of a loan the bank was only entitled to a return of the principal with interest. Crediting the bank with profits when the stock rose in value, and charging it with the loss when it declined, is surely inconsistent with the theory that the stock was deposited with the bank solely to secure a loan. In passing upon this question, it was proper for the jury to consider the relations of the makers of the notes to the defendant, their financial irresponsibility, the understanding between the defendant and Curtis as to the character of the transactions, and all the surrounding facts and circumstances. That the defendant and Curtis were aware of the details of each and all of these transactions is amply established by the proof. Indeed, their contention is that the loans were in fact made to the defendant with the intention on his part to give the bank the benefit of any profits growing out of the transactions. We do not understand, however, that it is pretended that there was ever any guaranty of the loans enforceable against the defendant.

The natural result of representing these transactions as loans on Ice stock collateral instead of purchases by the bank of such stock was

that the reports to the Comptroller—themselves the subject of another series of counts—contained similar misrepresentations. The motive is obvious. If the Comptroller or his examiners had been advised that the bank was speculating in stocks of problematic and fluctuating value, the bank would have been called sharply to account. As late as January 24, 1907, the Comptroller believed that the transactions in question were loans. He says:

"Attention is also called to the fact that a very large proportion of the loans are collateraled by stocks of speculative enterprises. In times less favorable than the present there would be grave danger of large losses on these loans. Of the $5,697,000 in loans to directors their corporations and other dealers of the bank, a large amount is secured by stock of the Ice Securities Company, the Clyde, Mallory, and Eastern Steamship Companies and other corporations in which Vice President Morse is interested."

The object of the law requiring periodical reports—not less than five annually—is to put the Comptroller in possession of the actual condition of the bank. This information he expects to receive, and this information the officers of the bank are expected to furnish honestly and truly.

Upon the assumption of the bank's ownership of the stock, as found by the jury, the acts of the president and vice president were not only ultra vires, but they were of a character so reckless that, if persisted in, they were certain to bring disaster to the bank's stockholders and creditors.

It is true that the defendant did not make any of the entries in the books or reports with his own pen. All of them were made by the employés of the bank as part of their routine work.

If it were necessary to prove against a director that he actually made the entry charged to be false, conviction under the statute would be impossible, as these entries are invariably made by subordinates in the executive department. Congress was not seeking to punish the ignorant bookkeeper who copies items into the books as part of his daily task, but the officers who conceived and carried out the fraudulent scheme which the false entry was designed to conceal. It is wholly immaterial whether such officer acts through a pen or a clerk controlled by him.

The argument of the defendant as to false entries and the responsibility for making them will be further discussed below in connection with the next series of counts.

The testimony supporting the counts alleging false entries as to Ice stock is of the same general nature and need not be considered in detail. Assuming that the facts warranted the jury in finding that the transactions represented by the Brown and Whiting notes were purchases of stock by the bank and were not loans with these stocks as security, the finding that the entries were false follows almost as a matter of course. The entries on the books and reports show that these transactions were loans, concededly they were not loans to Brown and Whiting, and there was testimony sufficient to support the finding that they were actual purchases. No examination of the books and reports would have led to a discovery of the truth, and the jury may

well have found that the entries were false and made with the intent denounced by the statute.

The entries in question were false because they stated the existence of transactions which the jury found never took place. They were not entries of improvident or fraudulent loans, but entries as loans of transactions that should have been entered as sales to the bank of speculative stocks. There is a distinction between a real, although fraudulent, note, and a fictitious or sham note which represents no real transaction. The jury were warranted in finding that these were merely sham notes, that the makers gave them with no intention of assuming responsibility, and that the bank accepted them with the same understanding.

The entries in question found their way to the books and reports because the defendant set the machinery in motion which required the entries to be made. He knew every detail of the various transactions. They were all devised, accepted, or engineered by him, and the jury were justified in finding that the entries were false, that the defendant knew them to be false, and that they were made with intent to deceive.

Certain transactions concerned with stock of the Bank of North America may next be considered. They are covered by counts 17, 18, 19A, and 20A, all false entry counts.

Count 17 charges: That Morse (director and vice president) and Curtis (director and president) did on April 11, 1906, unlawfully and knowingly make a certain false entry in a report, which it was the duty of the bank to make to the Comptroller of the Currency, and which it did make, showing the condition of the bank at the close of business on April 6, 1906, attested by the signatures of three directors, including defendants. That the false entry was to the effect that, at the close of business on the last-mentioned day, the amount of "bonds, securities, etc., including premiums on same" (see schedule) was $564,330; whereas, as defendants at the time well knew, the bank was then the owner of 331 shares of its own capital stock (value $96,783.25), but said sum was not included in the entry nor were the said shares of stock set forth in the schedule. Intent is charged to injure and defraud the bank and its stockholders and to deceive the other officers of the bank and any agent who might thereafter be appointed by the Comptroller to examine the affairs of said bank.

Counts 18, 19A, and 20A contain similar charges as to reports to the Comptroller of the condition of the bank on June 18, 1906, September 4, 1906, and November 12, 1906, respectively.

These four counts are very clearly expressed, and it is not understood that any question is raised as to their sufficiency in form. The facts of which they are predicated are as follows: The defendant Morse, between December, 1905, and July, 1906, ordered Primrose & Braun, stock brokers, whenever they learned of any odd lots of the stock of the Bank of North America for sale that they could buy reasonably, to pick it up. This would tend to keep the price of the stock steady and be for the interest of the stockholders, including defendant, who was the owner of upwards of one-third of the shares of its stock and had loans outstanding on which some of this stock was pledged

as collateral. What happened was this: Each lot of stock was delivered to Primrose & Braun by the seller and put in their name with transfer executed in blank. It was sent by messenger, who presented himself at the bank, received a cashier's check, for the price, and delivered the certificate. In accordance with instructions received from Curtis, the loan clerk thereupon made out a demand loan note for the amount, bearing 6 per cent. interest, took it to Miss K. A. Wilson, and had her sign it. He then placed it with others in an envelope marked in her name. She was Morse's private secretary, with no resources other than her salary. The notes she signed were personal without collateral. The following excerpt from the brief of defendant thus summarizes the transaction:

"The bank books showed, under date of each of these loans, that Primrose & Braun received cashier's checks for sums corresponding with the amounts of said loans, in payment for varying quantities of shares of the capital stock of the National Bank of North America; the amount of check also including broker's commissions. The price of the stock varied from 270 to 300 per share. On the date of each one of these payments to Primrose & Braun the bank books showed that a loan was entered in the name of K. A. Wilson for the amount of the payment to Primrose & Braun. It seems that Curtis would notify either Primrose or Rado that a certain number of shares of the bank's stock would be delivered by Primrose & Braun on that day, for which they should pay at a certain rate and make a demand loan in the name of K. A. Wilson. Pringle & Rado, when the stock came in, would make a note for the amount paid Primrose & Braun and have Miss Wilson sign. No collateral was held against these loans between January and July, 1906. The stock would then be turned over to the transfer clerk and retained in the possession of the bank. The number of shares acquired in this way amounted on April 6, 1906, to 331 shares; on June 18, 1906, to 428 shares; and on July 2, 1906, to 430 shares. This stock was carried on the register of the bank between January, 1906, up to and subsequent to January, 1907, in the name of Arthur Braun, or Primrose & Braun. No interest was collected from K. A. Wilson on these loans; and from time to time dividends were paid to Primrose & Braun, and Primrose & Braun would thereupon give the Bank of North America a check for the amount of said dividends, which was credited on the books of the bank as 'Interest Received.'

"On July 2, 1906, the total of this series of Wilson loans amounted, without interest, to $125,376.75. On that date the National Bank of North America received a cashier's check of the Bank of New Amsterdam, drawn to the order of the Bank of North America, for $125,376.75, which was credited on said K. A. Wilson loans and they were marked paid. On the same day it appeared from the books of the Bank of New Amsterdam that a loan had been made to K. A. Wilson on her note secured by 430 shares of the stock of the National Bank of North America, for the sum of $125,376.75. Statements of the amount of interest due on this loan would be sent to Miss Wilson by the Bank of New Amsterdam, and the Bank of North America would issue and deliver a cashier's check, signed by Curtis as president, to the Bank of New Amsterdam therefor. While his loan was in the Bank of New Amsterdam a dividend check for dividends on said stock was received by Primrose & Braun, who deposited said check in their own bank and in turn sent their check to the National Bank of North America for the amount of said dividend."

The defendant Morse was a director of the Bank of New Amsterdam.

While the stock was in the possession of the Bank of North America, it was not kept in the customary tray in which collateral for loans was kept in the loan department, nor entered in the special deposit book in which securities carried by customers were often entered; it was kept

by Rado, assistant cashier, in a clip or file in his possession. No interest was ever collected or asked for from Miss Wilson. While the stock was in the possession of the Bank of New Amsterdam, the Bank of North America received a check from the New York Construction Company, one of its customers, for $7,125 paid as commission on loan. This sum it paid over to the Bank of New Amsterdam to be credited on the principal of the loan by the latter bank, of $125,376.75 to Miss Wilson.

Section 5201, Rev. St. U. S. (U. S. Comp. St. 1901, p. 3494), provides that:

"No association shall make any loan or discount on the security of the shares of its own capital stock, nor be a purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith; and the stock so purchased or acquired shall within six months from the time of its purchase, be sold or disposed of at public or private sale; or, in default thereof, a receiver may be appointed to close up the business of the association, according to section fifty-two hundred and thirty-four."

Upon these facts the fundamental question was: Who bought the stock of the Bank of North America?—a question which was submitted to the jury on conflicting evidence. Morse testified that he bought it for the object named—to keep the price of the stock steady —that these purchases from time to time were paid for by loans to him in Miss Wilson's name for whatever amount was needed. Curtis testified that the Wilson notes were used for the purchases of bank stock, that at the commencement he heard Morse tell her to make these notes. The government relied on the circumstances that the purchase price was paid directly in the form of cashier's checks to the brokers; that the bank received all dividends on the stock; that it paid all interest necessary to carry the same and stood the loss caused by the failure of the dividends to equal the interest; that no claim was made on Miss Wilson for the same; that funds belonging to the bank were applied in reduction of the loan after it was transferred to the Bank of New Amsterdam; that so long as the stock remained in the Bank of North America it was treated in respect to its custody as belonging to the bank and not to customers; that while there Curtis was heard to say to Morse that the Wilson loan should not be in the bank; that while the loan to Miss Wilson was outstanding in the Bank of New Amsterdam it was criticised by the Comptroller of the Currency on the ground that the examiner was of the opinion that Morse was in some way interested in it; that he and two of his co-directors in that bank replied that Morse was not directly interested in this loan and that the maker was absolutely good, and the note would be paid if there were no security for it.

The evidence fully warranted the submission to the jury as a question of fact: "Who owned this stock, the bank or Morse? Who owned it in fact?" The court thus phrased it, no exception was reserved to the charge on these counts, and there was no request to charge with regard to them specifically. The finding of the jury on the proofs is conclusive upon the appellate court. Crumpton v. U. S., 138 U. S. 361, 11 Sup. Ct. 355, 34 L. Ed. 958; Burton v. U. S., 202 U. S. 344,

26 Sup. Ct. 688, 50 L. Ed. 1057. Indeed, if sitting as triers of the facts, we would be inclined to reach the same conclusion upon this record.

Error is assigned to the refusal to direct a verdict for defendant on these four counts on the ground that because of the prohibition of section 5201, above quoted, any attempted purchase by the bank of its own stock would be wholly void ab initio, an absolute nullity, citing Transportation Company v. Pullman Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, and Burrows v. Niblach, 84 Fed. 111, 28 C. C. A. 130. We cannot assent to the proposition that the unlawful acquisition of shares of its own stock is a nullity absolving the bank from reporting the fact to the Comptroller. The views expressed in National Bank v. Whitney, 103 U. S. 99, 26 L. Ed. 443, Fortier v. New Orleans Bank, 112 U. S. 439, 5 Sup. Ct. 234, 28 L. Ed. 764, and Walden v. Nat. Bank, 130 N. Y. 221, 29 N. E. 127, 14 L. R. A. 211, require a different conclusion.

It is further contended that a verdict should have been directed for defendant on the ground that a purchase by the bank of shares of its own stock would extinguish the stock thus purchased until it might be reissued, so that there would really be no item of property to include in a report. In view of the provisions of the national bank law (section 5143, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3463]), prescribing the formalities upon which alone the capital stock of a bank can be reduced, this contention is unsound.

It having been established by the verdict that these shares of stock of the Bank of North America were in fact bought and owned by the bank, was there any false entry in regard to them? Concededly they appear nowhere in the reports referred to. These reports are made according to a form prepared by the Comptroller. That form contains a heading entitled, "Resources," under which is a subheading entitled: "8. Bonds, Securities, etc., including premium on same (see schedule)." On the succeeding page appears the schedule entitled, "Bonds, Securities, etc. (Bonds, Claims, Judgments and similar items should be included under this head)."

The defendant contends that, by reason of the language last quoted, it is to be inferred that the schedule covers only claims growing out of expressed promises to pay money, and does not include certificates of stock. Ordinarily the words. "Bonds, Securities, etc.," would include shares of stock, and it is apparent that the draughtsman of the form did not use the word "Securities" with any special restricted meaning, because twice on the same page, in the schedule of "loans and discounts," the phrase is used: "Secured by stocks, bonds and other personal securities." There is no other heading in the entire report under which shares of stocks owned by the bank could possibly be classified. It must be assumed that they were to appear somewhere, and the several reports which were put in evidence show that the persons who filled them out had no difficulty in understanding the heading "Bonds, Securities, etc.," because various items of the stock of different corporations are listed therein.

The main contention on this branch of the case is that the alleged

false entries are not false, but faithfully describe actual occurrences. The reports to the Comptroller which form the gravamen of these counts are, of course, taken from the books of the bank and do accurately and faithfully state what the books themselves disclose. But the real test of their truth or falsity is whether or not they faithfully represent the original transaction—that they were repeated automatically through a long series of books and documents is immaterial. We have the facts established by the verdict that the bank bought and owned this stock. At the time of the purchase, a paper in the form of a promissory note was before the bank employé whose duty it was to record what had taken place. That paper falsely represented the transaction; the bank had not loaned Miss Wilson the money on her personal obligation to repay it, but had paid the money out to certain brokers as the consideration for shares of stock, which it had purchased. The recording employé, relying on the paper, made an entry which presumably he had no reason to suppose was untrue, which described the transaction as he supposed, and had good reason to suppose, it to be, but the entry, being contrary to the actual fact was none the less a false one, although the employé who innocently made it could not himself have been convicted of a violation of section 5209. Every entry therefore in the books and documents, which asserted that on the day named Miss Wilson borrowed the sum named from the bank, and every entry which undertook to enumerate the property belonging to the bank, and omitted the shares of this stock bought on that day, is a false entry, because it "represented as an actual occurrence one which did not exist," or was "false in a material part." Coffin v. U. S., 162 U. S. 664, 679, 16 Sup. Ct. 943, 949, 40 L. Ed. 1109.

The entries therefore in the four reports to the Comptroller which purported to set forth the "Bonds, Securities, etc.," and omitted all mention of any of this stock, were false. Who was responsible for their appearance in those reports? It is not disputed that it is no longer the law that only the person who actually writes the entry can be convicted under section 5209, but it is contended that there is no evidence whatever in the record that the defendant gave any direction to any of the clerks or employés of the bank in regard to the making of entries in reports to the Comptroller. The contention is thus stated in the brief:

"The rules and regulations of the bank intervened between the act of the defendant Morse and the making of such false entries. In order that one may be guilty of the offense denounced by the statute, he must direct the doing of the prohibited act, that is, the making of the false entry itself; and before the defendant can be found guilty it must appear from the testimony that he directed the very act which the statute prohibits and not the doing of some other act which, by reason of the intervention of some other force or duty acting upon a third person, results in the making of a false entry."

The argument submitted in support of this proposition is long and elaborate, but too refined for practical application. Manifestly, whoever caused the original false entries to be made in the books would be responsible for the repetition of such entries automatically in reports drawn up from the books. If on the day the bank bought some

of these shares Miss Wilson had not appeared or signed anything, but defendant had orally instructed a recording clerk to enter a demand loan of hers for the amount, he would have been responsible for such entry and equally responsible if he had given similar, instructions in writing. Is the situation in any way different because similar instructions are given indirectly? Miss Wilson had no personal concern in these transactions; she was Morse's employé, carrying out his instructions; this is not disputed. He sends her to the bank to sign and leave with it a paper which represents that on the day named she had borrowed a sum of money, which, in fact, she had not borrowed, well knowing that the result of leaving such paper there will be the recording of such a loan in the books and the omission from the books of any entry to show that the bank had actually bought shares of its own stock on that day. It seems to us that defendant is as fully responsible for any false entries which necessarily result from the presentation of these pieces of paper which he caused to be prepared as he would if he had given oral instructions in reference to them or had written them himself.

This conclusion does not seem to run counter to any of the authorities cited by defendant's counsel. In U. S. v. Booker (D. C.) 98 Fed. 291, defendant appeared, not at the beginning, but at the end, of the recording action. He merely signed and verified reports prepared by others which was held not to be the equivalent of making the false entry which they contained. In Twining v. U. S., 141 Fed. 41, 72 C. C. A. 529, there was no evidence (the "witness was not at all sure") that Exhibit No. 7, which came into Davis' possession with an additional sheet containing memoranda in Twining's handwriting, was handed to him by Twining. There is no doubt here that defendant himself caused Miss Wilson to sign and leave the several notes with the bank. In U. S. v. Harper (C. C.) 33 Fed. 471, Agnew v. U. S., 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624, and U. S. v. Youtsey (C. C.) 91 Fed. 864, there was evidence of express directions to make the particular entries. As we have previously seen when considering the Ice stock transactions, the motive for thus covering up the purchase so that the reports to the Comptroller would not disclose it is manifest. Had that officer been advised of the real transaction, he would at once have ordered the stock to be sold, and the scheme for keeping the price steady by purchases with the bank's own money of its own shares would have been abruptly terminated.

Error is assigned upon exception duly reserved to the charge as to inferring intent from the transactions themselves. The passages criticised are these:

"If, however, you should find that they made or caused to be made a false entry in a book of the bank, or a report to the Comptroller of the Currency, 'You are authorized to presume from that false entry itself, in the absence of any explanation or of any other testimony, that they knew such entry to be false.' * * *

"Any one of these intentions is sufficient under the act, and, as has been pointed out, this intent may be inferred from the false entry itself in the absence of explanation. The law presumes that a man intends the legitimate consequences of his acts, and if the natural and probable consequence of a false entry in a book or a report of the bank is to deceive the Examiner, or to

injure or defraud the bank, or deceive any of its officers, you are authorized to presume from the entry itself that it was made with that intent. It is no defense to a wrongful act, knowingly and intentionally committed, that it was done with an innocent intent."

These propositions are supported by a long line of authorities. U. S. v. Allis (C. C.) 73 Fed. 170; Id., 155 U. S. 117, 15 Sup. Ct. 36, 39 L. Ed. 91; U. S. v. Peters (C. C.) 87 Fed. 984; Id., 94 Fed. 127, 36 C. C. A. 105; Id., 176 U. S. 684, 20 Sup. Ct. 1026, 44 L. Ed. 638; U. S. v. Harper (C. C.) 33 Fed. 471; U. S. v. Lee (C. C.) 12 Fed. 819; McKnight v. U. S., 115 Fed. 972, 54 C. C. A. 358; Agnew v. U. S., 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624; U. S. v. Youtsey (C. C.) 91 Fed. 875; Coffin v. U. S., 162 U. S. 683, 16 Sup. Ct. 943, 40 L. Ed. 1109.

The motives which actuate men can be ascertained only by a scrutiny of their acts. One who passes a counterfeit coin, knowing it to be counterfeit, and receives value in return, is not permitted to say that he did the act with innocent intent, and the same rule applies to the crimes we are now considering. A bank officer who willfully misapplies the funds of the bank, or who makes or causes to be made a false entry in its books, knowing it to be false, cannot be heard to say that he did the act innocently. The misapplication of its funds necessarily tends to injure or defraud the bank, and he who commits the act cannot escape the natural inference which flows therefrom. So, too, as to a false entry, such an entry is calculated to deceive, and he who made it, or caused it to be made knowingly, cannot avoid the inevitable presumption.

Moreover, in immediate connection with the passages above quoted and complained of, the court charged:

"In this case you have the evidence of the defendants as to the acts, and you have their explanations. If you find that they made personally or by direction any of the false entries charged knowingly, you must determine with what intent they did it from their acts; from the natural and legitimate consequences of such act, from the explanations given, and from all the evidence before you."

In view of the conclusions we have reached as to the conviction under the 14 counts already discussed, it seems unnecessary to review the remaining counts, referred to on the argument as "Mercantile Bank false entry counts," "New Amsterdam Bank false entry counts," "Knickerbocker Trust Company false entry counts," and "overdraft misapplication counts."

It may be proper, in this connection, to state that a majority of the court is of the opinion that the evidence relating to the "overdraft counts," numbered 21 to 29 inclusive, was insufficient to warrant conviction.

There were numerous objections to the admission or rejection of evidence, many of which have been presented in the briefs and at the argument.

In an unusually protracted trial, depending upon a wilderness of figures, and during which a vast number of complicated transactions were investigated, it is not unnatural that mistakes should have been made. Neither is it surprising that judges removed from the excite-

ment of the forum, who have time to examine the events of the trial as they appear when portrayed in cold type, should have discovered some rulings which may be open to criticism. But we are convinced that no prejudicial error was committed.

Most of the exceptions to evidence bear upon counts other than those charging false entries as to Ice stock and as to the bank's own stock. They need not be discussed, since our affirmance is based on those 14 counts only. Error is assigned to the admission of certain correspondence of the Comptroller of the Currency with the bank. In admitting it the court stated that the letters were not evidence of the facts stated; they were material as showing the attitude of the Comptroller towards this bank and were illuminative as to motive, showing the importance of concealing from that officer any extension of loans to Morse, or which he guaranteed, or which were based upon enterprises in which he was interested. Error is also assigned to permitting the witness Rado, the assistant cashier, to testify to conversations with Curtis as to the Ice stock, and to the admission of a letter from Curtis to Morse referring to "our Ice holdings." But when the evidence was admitted the counts charging Morse and Curtis with conspiracy as to these transactions were in the case—the jury acquitted as to those counts—and under well-known principles it was properly admitted.

We fully realize the consequences to the defendant which must follow an affirmance of this judgment, and yet we cannot doubt that he was given a fair trial, and that the verdict on these 14 counts was amply sustained by the proof. No unprejudiced person can read the record without being convinced that by the defendant's procurement the bank bought its own stock and the stock of the Ice Securities Company, and that by his procurement the entries in the bank books and in the reports to the Comptroller as to these transactions were so arranged as to conceal the truth, and to record transactions which in reality never took place.

The judgment is affirmed.

## On Motion to Amend Mandate.

The application made by plaintiff in error to amend the mandate of this court affirming the judgment of conviction is granted to extent of adding thereto the following:

"Without prejudice to the right of plaintiff in error to move in the Circuit Court for a new trial or for any other or further relief."

Such amendment, however, is not to be taken as indicating any expression of opinion by this court on the question whether or not the Circuit Court has jurisdiction to entertain such motion, and without expressing any opinion as to whether such amendment is necessary to enable plaintiff in error to make such motion in that court.