## UNITED STATES v. MORSE et al.

(Circuit Court, S. D. New York. April 29, 1908.)

1. BANKS AND BANKING—NATIONAL BANKS—MISAPPLICATION OF FUNDS—INDICTMENT.

An indictment alleging that defendants, being officers of a national banking association, willfully and fraudulently, and with intent to injure and defraud the association for the use and advantage of M., misapplied certain money of the association, to wit, $126,000, and that M. made a certain check on the bank payable to H. for $126,000, and delivered the same to him, defendant M. knowing at the time that he did not then have on deposit with the bank the amount specified therein, but that M. as vice president and C. as president caused the check to be paid from moneys of the association, with intention on the part of M. to convert the amount to his own use, repayment not having in any way been secured and M. having no right or title thereto, stated an offense under Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), declaring that every president, director, cashier, etc., of any national banking association, who willfully misapplies any of the moneys, funds, or credits of the association, shall be guilty of a misdemeanor, and was not fatally defective for failure to charge that the overdraft payment was unauthorized, that it was an actual conversion of the amount paid, or that the money was in some way absolutely lost to the bank.

2. SAME—CRIMINAL MISAPPLICATION.

In order that there shall be a criminal misapplication of the moneys, funds, or credits of a national banking association by its officers, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), making such misapplication a crime, there must be a conversion of the moneys, funds, or credits of the association by the accused, either for his own use or that of some person other than the injured bank.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, § 964.]

3. SAME—WILLFUL MISAPPLICATION.

In a prosecution against bank officers for misapplication of the bank's funds, an indictment alleging that defendants, being officers of the bank, willfully and fraudulently, with intention to defraud the association, did misapply certain moneys of the bank, etc., constituted a sufficient allegation of a criminal intent to defraud, which was the gravamen of the offense to be inferred from facts and surrounding circumstances.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, § 973.]

**4. SAME—BANK OFFICERS—AUTHORITY—CONVERSION OF FUNDS.**

Officers of a national bank possess no authority to produce or permit a conversion of the bank's funds to the use of one of such officers; authority to commit a crime being an impossibility.

**5. SAME—CONVERSION—SUBSEQUENT RETURN OF MONEY.**

Where one of the officers of a national bank willfully converted certain of the bank's funds to his own use, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), making such act a crime, it was no defense that the money was subsequently refunded; such fact being only evidence to negative the officers' intent to defraud at the time of the alleged conveyance.

**6. CONSPIRACY—NATIONAL BANKS—CONDITION—FALSE STATEMENTS.**

An indictment alleging the conspiracy to defraud the United States in the exercise of its governmental and fiscal functions, by deliberately giving false information regarding the financial condition of a national bank, the fraud resulting in lessening the power of the federal government by failure to maintain in efficient condition one portion of the national fiscal system, stated an offense against the United States; it being possible to have a conspiracy to defraud by merely deceiving a governmental officer, though neither the government nor the officer was deprived thereby of money or money value.

**7. BANKS AND BANKING—NATIONAL BANK OFFICERS—OFFENSES—FALSE ENTRIES.**

Where an indictment against bank officers alleged a conspiracy to make false entries in the books of the bank, one of which was charged to consist in entering in "call loans account" a "fictitious" promissory note as though it were a bona fide note affected by certain stock as collateral, whereas in truth the bank unlawfully owned the stock and the note was created and entered as a genuine note merely to conceal the illegality of the original purchase of the stock and the continued holding thereof, was not defective, in that the entry was a true entry of a fraudulent transaction only.

**8. SAME—STATUTES—CONSTRUCTION—"ENTRY."**

The word "entry," as used in Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), declaring that every officer, clerk, or agent of a national banking association who makes any false entries in any of the bank's books with intent to injure or defraud the association shall be guilty of a misdemeanor, means "an item in an account."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2400–2401.]

**9. WORDS AND PHRASES—"DOUBLE ENTRY."**

The phrase "double entry," as used in bookkeeping, signifies two entries of the same transaction.

**10. INDICTMENT AND INFORMATION—DUPLICITY.**

Where counts in an indictment against national bank officers in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), in alleging the transaction claimed to have been falsely entered, described two different entries or sets of words written down in different parts of the same book or report, each count revealing a false record by double entry, such counts were double, as it does not follow that, because the debit entry of a transaction is false, the credit entry of the same transaction was also false.

**11. BANKS AND BANKING—NATIONAL BANKS—REDUCTION OF CAPITAL—PURCHASE OF BANK'S SHARES.**

The only method by which a national bank can reduce its stock being that prescribed in Rev. St. § 5143 (U. S. Comp. St. 1901, p. 3463), and the possibility of ownership of its own stock being recognized by section 5201 (page 3494), the unlawful ownership of its own shares by a national bank did not constitute a pro tanto reduction of its corporate stock, and hence was improperly omitted from the bank's statements of assets.

Henry L. Stimson, U. S. Atty.
Wallace MacFarlane, for defendant Morse.
William M. K. Olcott, for defendant Curtis.

HOUGH, District Judge. The 29 counts of this indictment may be conveniently divided into: (1) Misapplication counts (21–29, inclusive), charging defendants with willful misapplications of the funds of the National Bank of North America, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497). (2) Count No. 1, charging a conspiracy to defraud the United States in respect of its sovereignty or power. (3) Counts 2 to 11, inclusive, charging conspiracies under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), to make false entries in books and reports in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497). (4) False entry counts (12–20, inclusive), charging substantive violations of Rev. St. § 5209, by making false entries in bank reports made to the Comptroller of the Currency.

### 1. The Misapplication Counts.

The important words (so far as these counts are concerned) of section 5209 are as follows:

"Every president, director * * * or agent of any association who * * * willfully misapplies any of the moneys, funds or credits of the association * * * with intent * * * to injure or defraud the association * * * or any individual person, * * * and every person who with like intent aids or abets any officer * * * in any violation of this section shall be deemed guilty of a misdemeanor."

All these counts are alike in their method of stating the alleged offense. Each in the same form of words alleges the willful misapplication of a specific sum of money in substantially the same way. Reduced to its simplest form, by omitting formal words and many epithets and adjectives common in all pleadings, the material parts of the twenty-first count are as follows:

Morse and Curtis, being officers of the banking association, willfully and fraudulently and with intent to injure and defraud the association for the use, benefit, and advantage of Morse, did misapply certain moneys of the association, viz., $126,000.

This is the charging part, and follows substantially the language of the statute. Then is declared the manner and means by which the alleged violation occurred. And, again omitting repetitions, legal verbiage, and condemnatory adjectives, the story is as follows:

Morse made a certain check on the Bank of North America, payable to the order of Augustus Heinze, for $126,000, and delivered the same to Heinze, Morse at the time knowing that he did not then have on deposit with said association the amount specified therein; and Morse as vice president and Curtis as president caused to be paid upon said check $126,000 of the moneys of the association, in excess of all amounts which Morse was then entitled to draw out of the moneys, funds, and credits of the association. Morse and Curtis then intended that Morse should appropriate and convert to his own use said $126,000, although they then well knew said $126,000 so paid as aforesaid was not on deposit with the association by Morse, and was not due and owing by and from the association to Morse. Repayment thereof to the association was not in any way secured, and Morse had no right and title to the same.

The wording of this count is very different from that of the indictment lately considered by this court in United States v. Heinze, 161 Fed. 425, in that it does not expressly charge that the transaction complained of was without the knowledge or consent of the national bank or its directors, does not assert that the money paid on the check was wholly lost to the banking association, and does not totidem verbis allege an actual conversion by the accused of the moneys, funds, and credits of the bank at the time of the payment of the check. The demurrer, therefore, raises the inquiry whether an indictment which in substance alleges an overdraft, asked and granted with intent to defraud the paying bank, and with intent that the person receiving the overdraft should convert the proceeds thereof to his own use in fraud of the bank, constitutes a legal statement of the crime of willful misapplication under section 5209.

The position of defendants is that the absence of allegations (a) that the overdraft payment was unauthorized, or (b) that there was an actual conversion of the amount paid, or (c) that the money was in some way absolutely lost to the bank, renders the indictment insufficient, because it does not properly negative the presumption of law that a mere overdraft is not an illegal transaction and cannot of itself constitute a willful misapplication of the paying bank's resources. This form of indictment under section 5209 has been repeatedly used in this district. It follows (mutatis mutandis) several of the counts in United States v. Fish (C. C.) 24 Fed. 585, and is also in legal effect identical with the ninety-ninth count in Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830; in both which cases indictments were found and convictions had, subsequent to the decisions in United States v. Britton, 107 U. S. 655, 2 Sup. Ct. 512, 27 L. Ed. 520, and 108 U. S. 192, 2 Sup. Ct. 525, 27 L. Ed. 703.

However unfortunate, if not unnecessary, was any departure from the plain rule that a statutory misdemeanor is sufficiently alleged in the language of the statute, the Britton decisions are plain that not every misapplication is a crime under the act, and that the test (or at least a test) of criminal misapplication is that there must be a conversion of the moneys, funds, or credits of the association by the accused, either for his own use or that of some person other than the injured bank. This is more than a rule of pleading. Unless such conversion be shown in evidence there can be no conviction; but it follows from this substantive law that an indictment alleging willful misapplication must show upon its face the criminality of the transaction described and negative an innocent interpretation, if one be possible. 107 U. S. 669 et seq., 2 Sup. Ct. 512, 27 L. Ed. 520. The Britton decisions, however, do not declare any hard and fast method of pleading under section 5209, as is abundantly shown by the later decisions in the same court.

The Fish Case, supra, was decided in the light of the Britton opinions, and the judgment of Benedict, J., on this point was concurred in by Judges Wallace and Brown—a concurrence in my opinion of the greatest weight. The count considered was in form exactly like the one at bar, and this court decided that the Britton discount indictment (108 U. S. 192, 2 Sup. Ct. 525, 27 L. Ed. 703) was held bad only

because it was not charged that the discount was originally procured by fraudulent means, and the stock purchase indictment (107 U. S. 655, 2 Sup. Ct. 512, 27 L. Ed. 520) was bad because of total failure to charge any criminal misapplication at all; the implication being (continued Benedict, J.) that, had the act of discount "been done in bad faith and with intent to defraud," it would have been punishable under section 5209. In the Fish indictment and the count at bar bad faith and intent to defraud are charged in general terms and with respect to the original creation of the overdraft. It was therefore held that the indictment against Fish was good, and it follows that that decision is an authority directly opposed to defendant's contention in this case.

Two years after the Fish decision, U. S. v. Northway, 120 U. S. 327, 7 Sup. Ct. 580, 30 L. Ed. 664, was decided. I have not been able to examine the indictment therein, and the question certified was not one of pleading; but the court (after reiterating the rule in Britton's Case) said:

"When it is charged * * * that the defendant did willfully misapply certain funds of the association by causing them to be paid out to his own use and benefit in unauthorized and unlawful purchases, without the knowledge and consent of the association and with intent to injure it, this completed the offense of willful misapplication."

This reference to the knowledge and consent of the association, and its possible authority to do the act complained of, must be read in connection with Evans v. U. S., 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830, and, as so read, the Northway decision is not opposed to that in Fish's Case.

In 1893, with the Britton and Northway Cases before him, Judge Benedict decided United States v. Eno (C. C.) 56 Fed. 218. The Eno indictment had been found in 1884, and reasons for hearing a demurrer thereto in 1893 do not appear on the record. Contemporary local history may furnish some excuse for perfunctory argument, but the judgment requires respectful attention. Eno was charged with causing a payment to be made to Dyett of moneys of the Second National Bank, of which he was president. The court held that the indictment did not charge that the money was paid to or received by Dyett to Eno's use. nor that such payment to Dyett was really a payment to Eno, wherefore it was not shown that the pament was unlawful as to Dyett, and the count was bad under the rule in Britton's Case. This as a statement of general law need not be here disputed, but it is inapplicable to this indictment without departing from the Fish Case, which as a pronouncement of the full court is of superior authority. The further ruling of the Eno Case that allegations of "intent to defraud" or "intent to injure" are mere surplusage is opposed to the later decision in Evans v. U. S., 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830, and must be disregarded.

The Evans Case contains, as above noted, an overdraft count legally identical with the one at bar. Evans had been convicted, not only under that count, but under others alleging unlawful discounts. The writ of error was once argued, and a reargument ordered only

as to the counts alleging offenses other than overdrafts. It is now urged that, inasmuch as Evans' sentence was no greater than would have been justified under one count, the nature of the reargument ordered shows that the overdraft count was considered clearly bad, though nothing is said about it in the opinion reported. I cannot believe that the Supreme Court sits to decide important matters by any such indirection, and am of opinion that the reported discussion of the unlawful discount portion of the indictment is valuable and decisive of the present argument.

The discount of a note, like the granting of an overdraft, is not of itself an unlawful act, much less a crime. The motive, purpose, or intention with which the payment by draft or discount is made and received determines the difference between legality and illegality, honesty and crime; and motives, purposes, or intentions are absolutely known only to the person accused, and in the absence of confession or admission can only be determined or ascertained by court or jury by inference from surrounding circumstances, usually numerous, and singly inconclusive, if not unimportant. It may be said here, as in that case, that:

"Defendant's entire criticism seems to be founded upon the hypothesis that no weight is to be given to the words 'willfully, unlawfully, and fraudulently,' or to the general allegation of an intent to defraud; in short, that these words are mere surplusage."

This contention the court rejected, holding that, while "willfully misapply" are words not inconsistent with honest purpose, yet, since an intent to defraud is only to be gathered from facts and circumstances, an allegation of intent to defraud is material in the highest degree, since the "gravamen of the offense consists in the evil design." It must follow that when the indifferent facts, the acts reconcilable in themselves with either honesty or criminality, are clearly stated, a general allegation of criminal intent gives to the accused every warning he can reasonably claim, because the only question left (if the facts alleged are true) is addressed to his own consciousness, concerning which he alone has full information. Not only does the opinion of the court in the Evans Case illuminate the matter in hand, but the dissenting opinion of Field, J., shows that the very principles now contended for were there fully and ably presented and emphatically repudiated.

Batchelor v. United States, 156 U. S. 426, 15 Sup. Ct. 446, 39 L. Ed. 478, arose under an indictment for discounting worthless paper. The decision seems to me unrelated to the present question; but Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481, is conclusive of a point which has caused me great doubt. The count at bar does not charge that there was a conversion. It only states an intent to convert. In that respect it is exactly like the overdraft count in Coffin's Case. The Coffin indictment stated, however, several facts plainly indicative of actual conversion, and the court said:

"The fact that the count charges the intent to convert money * * * does not obliterate the clear statement of the actual conversion. In this regard the count is clearer and stronger than was held sufficient in Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830."

When saying this the court had before it only an overdraft count, and the reference to the Evans Case can only reasonably relate to the overdraft count then considered, but not discussed in the opinion, and identical with the one under consideration. If this be not so, it surely means that overdraft and discount counts are to be measured by exactly the same rules.

Rieger v. United States, 107 Fed. 916, 47 C. C. A. 61, holds explicitly that it is not necessary in terms to allege a conversion. That may be inferred from the allegation of payment or application to the use, benefit, and advantage of the accused or another. United States v. Martindale (D. C.) 146 Fed. 280, declares it a fatal objection not to negative the knowledge and approval of the governing authority of the bank. This is not consistent with Evans' Case, 153 U. S. 593, 14 Sup. Ct. 934, 38 L. Ed. 830.

On principle these defendants could not have possessed authority to produce or permit a conversion of the funds of the bank to Morse's use. Authority to commit a crime is an impossibility, yet nothing short of that power meets the exigencies of defendants' case if the allegations of the count are true as pleaded. It cannot be necessary to negative a legal impossibility. To assert, as does this count, that the payment for the contemporaneous benefit of Morse was willfully made, with intent that Morse should convert the same to his own use, without securing repayment, and with intent to defraud, does clearly aver a conversion of the funds, effected as soon as the bank paid over the money.

Conversion is a technical term, and it is a fair question: Could the bank have maintained an action sounding in tort against Morse for this $126,000, directly it was paid out, assuming ability to prove the above-recited allegations? I think it could, and, if so, the conversion is sufficiently alleged. The fact that at some subsequent time the money was refunded would be perhaps persuasive evidence that there was no intent to defraud; but that the pecuniary loss remained actual down to indictment must be immaterial. The return of goods alleged to have been stolen may be evidence that they were only borrowed, and such return may estop the owner from civil suit; but, if the goods were really taken animo furandi, their ultimate loss or return is immaterial to a criminal prosecution. The crime was committed when the taking occurred, and no subsequent repentance or reparation can wipe that out. So here, if the evil intent described by the statute was in these defendants when the bank parted with its money for Morse's benefit, and without recourse to any person other than Morse, then it is immaterial (except as explaining mental processes) whether Morse or any one else ever refunded the same. The demurrers to the misapplication counts are overruled.

## 2. The First Count.

This alleges with elaboration a conspiracy to defraud the United States in the exercise of its governmental and fiscal functions, by deliberately giving false information regarding the financial condition of the Bank of North America; the fraud resulting in lessening the

power of the federal government by failure to maintain in efficient condition one portion of the national fiscal system. I remain of the opinion, expressed on the argument, that indictments of this kind under section 5440 are too firmly established by authority to be overthrown in trial courts.

To cause or conceal a rotten spot in the national banking system is an assault on the government quite as direct and obvious as is foisting into public employment a probably incompetent letter carrier. The doctrine of Curley's Case, 130 Fed. 1, 64 C. C. A. 369, has been approved so often and in so many courts that I consider discussion here useless. Curley's petition for a certiorari and the briefs thereon (195 U. S. 628, 25 Sup. Ct. 787, 49 L. Ed. 351), have been submitted to me and carefully examined. The question whether there could be a conspiracy to defraud by merely deceiving a governmental officer, when neither government nor officer was to be deprived thereby of money or its worth, was presented to the Supreme Court so fully and forcibly, yet so simply and directly, that the refusal of the writ is certainly an authority demonstrating the willingness of the highest tribunal to let the law alone. I overrule this branch of the demurrer.

### 3. The Specific Conspiracy Charges.

The second and eleventh counts, which charge a conspiracy in very general terms, have not been attacked in argument; but counts 3 to 10, each of which alleges a conspiracy under section 5440 to make a false entry in a book of the bank, are asserted to be defective, in that the contemplated entry was, or was intended by defendants to be, not a false entry, but a true entry of a fraudulent transaction, and therefore not within the act. Coffin v. U. S., 156 U. S., at page 463, 15 Sup. Ct. 394, 39 L. Ed. 481. An illustration of the sort of false entry alleged may be taken from count 3, which charges defendants with entering in "call loans account" a "fictitious" promissory note as though it were a bona fide note accompanied by certain stock as collateral; whereas in truth the bank unlawfully owned the stock, and the note was created and entered as a genuine note merely to conceal the illegality of the original purchase of stock and the continued holding thereof.

It is obvious enough that "it cannot be a false entry to make a recital on the books of the bank which speaks the truth" (U. S. v. Young [D. C.] 128 Fed., at page 115), but the sort of truth referred to must be of legal standard; i. e., the whole truth, and nothing but the truth. It may be the truth that there was a note; but, if the note was "fictitious," it is not the whole truth to recite or record or enter it as a genuine note. There is a difference between a false record and the record of a falsehood—between a fraudulent entry and the entry of a fraud. The difference is that the latter exposes the falsity or fraud, while the former does not. If this note was fictitious—e. g., forged to the knowledge of the bank, or unenforceable against the maker by agreement of parties—it was no better than a blank piece of paper, and its inclusion in the "call loans" was as clearly within the statute as were the entries as bank cash of money not on deposit,

considered in U. S. v. Peters (C. C.) 87 Fed. 984. I have taken the word "fictitious" most strongly against the demurrant. Further than that there is no need of going at present.

### 4. Duplicity in Counts 12–16, 19 and 20.

These portions of the indictment charge substantial violations of section 5209 by making false entries. Each count clearly states and describes two different enterings or sets of words written down in different parts of the same book or report. It is said, however, that every count does no more than give the two sides of the false account; e. g., it shows falsity in "bills payable" and corresponding falsity in "securities"—in other words, that each count reveals a false record by double entry. I think "entry" is used in the statute in its simple and obvious meaning, viz., "an item in an account." Cent. Dict.

The very phrase "double entry" signifies two entries. It is common knowledge that bookkeeping by double entry requires, not two entries of the same fact, but a debit entry of that which the accounting party has received and a credit entry of that with which the accounting party has parted, or, to vary the statement, the transaction is recorded in two different ways. It does not follow that, if the debit entry is false, the credit entry must also be false, or that it is a part of the debit entry. The two things are entirely distinct, and it does not advance the discussion to point out that, unless the two entries are correspondingly false, a reasonably skillful accountant will detect the error. It is perfectly possible that one may be false and the other may be true. Indeed, it is by such discrepancies that dishonest bookkeeping is usually discovered, and at all events, as the very name "double entry" indicates, there were two entries made, and not one entry, and both of these entries are charged in these counts. These portions of the indictment are therefore, in my judgment, bad for duplicity, and the demurrer is sustained on that ground alone.

### 5. Counts 17 and 18.

The false entry charged in these two counts is that from the total amount of bonds, securities, etc., owned by the Bank of North America, there were deliberately omitted certain shares of the capital stock of that bank, which shares were then actually owned by the bank.

It is urged that, assuming such purchase by the bank, the moment the bank acquired ownership there was a pro tanto reduction of the corporate stock, with the result that it would have been untrue to enumerate the bank's own holdings among its assets; and this argument is rested on a remark of Woods, J., in Burrows v. Niblack, 84 Fed. 111, 28 C. C. A. 130. I think this is opposed to the general current of authority as stated in Cook on Stock Corporations, vol. 1, § 282, viz.: That such purchase "will in no case constitute a reduction when the corporation lacks authority from the Legislature to reduce its capital." That is the case with national banks. The only method by which a national bank can reduce its stock is that prescribed in section 5143, Rev. St. (U. S. Comp. St. 1901, p. 3463),

and the possibility of ownership of its own stock is recognized by section 5201 (U. S. Comp. St. 1901, p. 3494). It follows that there was here an unlawful ownership, but nevertheless an ownership, and the fact thereof should have been stated. The demurrers to these two counts are overruled.

Upon further consideration of defendants' motion to compel the prosecution to elect between the conspiracy counts and the misapplication counts, I have concluded not to compel such election. Study of the case shows the most intimate relation between the facts on which all the counts must stand or fall. It would be no assistance to the administration of justice to compel two trials, instead of one.