## HOUSE v. UNITED STATES. *
### No. 6913.

Circuit Court of Appeals, Sixth Circuit.
May 17, 1935.

Rehearing Denied June 28, 1935.

*Writ of certiorari denied 56 S. Ct. 125, 80 L. Ed. ——

William H. Boyd, of Cleveland, Ohio (Everett D. McCurdy, of Cleveland, Ohio, on the brief) for appellant.

E. B. Freed and Parker Fulton, both of Cleveland, Ohio, for the United States.

Before HICKS and SIMONS, Circuit Judges, and NEVIN, District Judge.

HICKS, Circuit Judge.

Appellant was president, a director, and a member of the executive committee of the Guardian Trust Company (hereinafter called the bank) of Cleveland, Ohio. As president of the bank he was ex officio presi-

dent and a member of the board of trustees of the bank's pension fund. Harry C. Robinson and William R. Green were senior vice president, and vice president and comptroller, respectively, of the bank; and Robinson as senior vice president was ex officio vice president of the pension fund. Green was the secretary-treasurer of the board of trustees of the pension fund but was not a member thereof.

Appellant and Green and Robinson, as such officers of the bank, were jointly indicted under section 592, tit. 12 U. S. C. (12 USCA § 592). In 16 counts they were charged with willful misapplication of the moneys, funds, and credit of the bank, and in 11 counts with making false entries upon its Sundry Trust Ledger.

During the trial the twenty-seventh count was dismissed, and at the close of all the evidence the court sustained a motion to direct a verdict of not guilty as to Robinson and Green on the remaining counts but overruled it as to appellant. Appellant was convicted upon 16 counts charging "willful misapplication" and upon 10 counts charging him with making false entries or causing them to be made. Each of the alleged misapplications had a related alleged false entry. Together the two made up a unitary transaction, the units of the series of which varied as to date and amount but were otherwise similar to each other. They all sprang from the same basic circumstances. Each "false entry" count was correlated to one or more "misapplication" counts; and the inclusion of more than one "misapplication" in some of the "false entries" resulted in the smaller number of "false entry" counts.

Appellant complains of the denial of a directed verdict and in particular that the evidence failed to show (1) that any money or funds of the bank were lost; (2) that he intended to injure or defraud the bank; and (3) that any false entries were made with intent to deceive. He maintained that the evidence showed conclusively that he acted as an officer of the pension fund and not as an officer of the bank.

Appellant also assigned as error the refusal of the court to instruct the jury in accordance with his request No. 2, which was in substance that even if funds of the bank were temporarily used as a step in the transactions complained of, yet if they were restored before these transactions were completed there was no misapplication; and further that the court refused to submit to

the jury his request No. 6 that if any one of the trustees of the pension fund had knowledge of the loans involved and failed to protest against them this was equivalent to a consent to make such loans.

There are certain other assignments of error to be hereinafter considered.

The bank was a large one, and highly organized. Its trust department contained three divisions, of which the "Sundry Trust" division was one, being a grouping of a large number of miscellaneous trusts. The whole trust department was necessarily tied in with the bank proper, since all the cash therein was deposited in the bank and was shown on the general books of the bank. The department itself kept account of its cash in a miscellaneous record and in its own general books. It made a record of individual checks, disbursed, and at the end of the day the record was sent to the auditing department. The general ledgers of the trust department recorded each day the transactions between the individual sundry trusts and the trust department through the tellers' sheets of receipts and disbursements.

Sundry Trust No. 635 was that of the pension fund. This fund was set up in August, 1913, and the employees of the bank and the bank itself contributed to it equally. Its management was vested in a board of trustees of seven members, four of whom were chosen by the board of directors of the bank and two by the employees. Appellant as president of the bank was ex officio the seventh member. By 1930 its assets were well over a million dollars.

In article VI, section 2, of its by-laws, under the heading "Investments," appeared the following: "Any part or all of the fund may be invested in first mortgage loans, or in participations therein, or in such other securities as the Board of Trustees may from time to time approve, and the Trust Department of the Guardian Savings and Trust Company shall be custodian of all investments."

In conformity with this declaration of policy, much of the pension fund was invested in mortgage participations. The transactions upon which appellant was indicted grew out of a desire upon his part as president of the bank to forestall depreciation in the value of the stock of the bank by buying up stock that was offered in the general market. The method he suggested was the formation of a syndicate of stock-holders each of whom would agree to buy a certain number of the offered shares. This practice antedated the transactions involved herein. In January, 1929, the bank increased its capitalization from four to seven million dollars, one million of which was a stock dividend and two millions of which were sold to the public, and it was thought that the appearance of so much new stock might unsettle the market. Accordingly appellant as president wrote identical letters to certain stockholders requesting that they subscribe for a number of shares and advance $25 per share toward their purchase. He received replies in which an aggregate of 2,350 shares was subscribed. The money paid in was placed in a trust fund opened in the name of J. A. House, trustee, and known as "Sundry Trust No. 1441 of the Sundry Trust Division." Later an additional $50 per share was called for. This syndicate was closed out with the purchase of but 311 shares. Each subscriber was given his portion of the total shares purchased and a check was issued to him for the amount of money he had overpaid.

Again in the fall of 1930, a second group was approached for the purchase of stock through a letter written by appellant as president on November 3. In this letter the directors and stockholders, notified, were urged to "round out" their holdings by the purchase of a suggested number of shares, the number varying according to the holdings of the different stockholders. Replies were received, some favorable, some unfavorable. This syndicate, called the "No. 394 Syndicate" from the number of shares purchased, was closed September 3, 1931, at which time letters were sent out advising the members of the number of shares they had subscribed, the average cost per share, and the amount due for which a check was requested.

This syndicate was not financed as was the first, i. e., through an advance from its members. The method used was substantially as follows: Appellant orally and by telephone spoke to a majority of the trustees of the pension fund who authorized a loan of $100,000 for the purchase of stock. The authorization was not in writing but it seems clear from the testimony of Daley and Dean, two of the trustees, that the loans to which they gave their approval, were to be to C. H. Force, trustee or agent for the group or syndicate of stockholders. His notes were made out to the bank for the amount of the sums borrowed on each pur-

chase and were held by the pension fund in lieu thereof and the stock acquired was put up as collateral. This syndicate was closed about September 3, 1931, and each of the participating members was advised and a bill sent for the cost of the shares allotted to him. Of the 394 shares thus acquired all but 66 were disposed of to the syndicate members. There was some misunderstanding about these shares and the members of the syndicate who had supposedly agreed to take them refused to do so.

The so-called "Third" syndicate here involved was constituted and conducted as follows: Upon being advised by Clayton H. Force, vice president of the bank, in charge of the stock transfer department, that a large block of stock, 90 shares owned by Mr. Spira, was on the market, and fearing the effect on the bank, appellant took up with a few members of the executive committee, after an adjournment of an official meeting of the committee on September 1, 1931, the matter of the formation of another syndicate. Appellant testified that of those present Mr. McIntosh, Sr., stated that if such a group were formed he would take 100 shares, Mr. Prentiss 50, Mr. Hall 25, Mr. Marlatt 25, and Mr. Bicknell 25. Appellant also testified that no subscriptions were conditioned upon putting the agreement in writing, and that when the group broke up he believed he had authority to buy up to 225 shares at a figure not to exceed $300 per share. But when Mr. Inglis, a lawyer, who was also a member of the executive committee of the bank, heard of the matter a week later, he counseled the drawing up of a written agreement setting forth the conditions under which the stock was to be purchased. He testified that Mr. Force drew up such an agreement and submitted it to him but it was never signed and nothing ever came of it. The only record kept of the meeting was a memorandum made either by appellant or some other officer present which was simply a list of the number of shares each subscriber agreed to take. There was testimony that subscriptions solicited privately after the meeting brought the authorized purchase up to 298 shares, including 20 shares subscribed by Mr. Inglis, but the matter is immaterial since only 221 shares were actually acquired under these oral authorizations.

Appellant directed Force to enter upon the acquisition of shares and authorized and approved the method of financing their purchase. This method was followed by Force in the purchase of 221 shares in different amounts on different dates between September 10 and October 19, 1931. Each of these purchases is made the basis of a "misapplication count" in the indictment and correlative "false entry counts." To avoid unnecessary detail and the risk of confusion, we deal particularly only with the first and second counts of the indictment involving the "Spira" transaction.

On September 10, 1931, the trust department of the bank issued a check to Spira drawn upon the bank for $23,848.20, the cost of his stock after $1.80 federal tax had been deducted. Force delivered the check, received the stock in exchange and had it canceled and reissued in the name of appellant, who indorsed it in blank. Spira cashed the check and the encashment is the basis of the first misapplication count. Force made out a demand note signed by him as agent for $23,850 payable to the bank, and this note was held in the pension fund. The stock was also held by the pension fund as collateral to the note. The office routine by which the transaction was carried through the various departments of the bank and recorded on its books was involved and need not be outlined further than to show that the Spira check was charged to S. T. No. 1441 which was maintained in the name of J. A. House, trustee.

S. T. No. 1441 was used for handling the purchase of Guardian stock. As it possessed no funds of its own the pension fund or S. T. No. 635 sold mortgage "participations" and placed the money to the credit of S. T. No. 1441 so that the Spira check might be paid therefrom. This transaction is recorded on September 10, 1931, in two lines on S. T. No. 635 cash sheet. The first line reads, "Sold participation," and is followed by the entry of $23,850 in the debit column. On the next line and on the same date appears, "Transfer to S. T. 1441 bought note C. H. Force Syn," which notation is followed by the entry of $23,850 in the credit column. This is the entry alleged in the second count of the indictment to be false.

As above indicated, the transactions upon which the remaining counts of the indictment were based, are similar; the last one occurring on October 13, 1931. Matters went along quietly from that date until July, 1932, the stock of the bank continuing to decline in value. In July, 1932, the shares purchased by Force at an average cost of $263 and held by the pension fund as collateral to the Force notes were worth only

about $70 per share. In other words, the $76,000 of Force notes were secured by stock worth but $18,000.

The purported subscribers to the "Third" syndicate were never called upon to take any of the 221 shares of stock purchased. Instead, on July 6, 1932, at a special meeting of the pension fund trustees, they were all purchased by the fund along with 66 shares carried over from the second syndicate, and the Force notes were canceled. Appellant as president presided at the meeting, advised that this action be taken, and voted for the resolution, knowing all along that the syndicate had not been completed.

Mr. Inglis testified: "I never got the stock which I had indicated I might take. *No one ever asked me to take the stock.*" (Italics ours.)

Mr. Prentiss said: "* * * I said I would take 50 shares. I never got those 50 shares. The transaction was never completed. I was never asked to take 50 shares."

James W. Warwick testified that he was approached by Mr. Howard Shepherd on the matter of entering the syndicate, and that he replied he "would go along for 20 shares." He said: "I left on a business trip soon after that, and probably three weeks after that I saw Shepherd again and he said, 'Just forget about that.' He said 'there wasn't enough interest, enough people interested in the proposition to go ahead with it.'"

Shepherd was a director, deceased before the trial.

William H. Marlatt testified: "* * * I said I would subscribe for 25 shares if such a syndicate was formed. * * * I never heard anything more about the subject."

Most of these men testified that although they did not specifically authorize Force to borrow money for them from the pension fund to buy the stock, they were content that the matter be handled in any way the officers of the bank saw fit.

We think there was substantial evidence to support the verdict upon all the counts of the indictment.

■ Referring again to the Spira transaction: It is clear that appellant as the president of the bank caused the Spira check to be issued. Its encashment by Spira was a misapplication of the bank's funds. Appellant as president was not authorized thus to withdraw its money. Whether he acted "willfully" as denounced by the statute, or in good faith as contended by him, was a question for the jury. The jury might reasonably have concluded that he acted for the benefit and gain of the purported members of the alleged syndicate and, if so, his conduct was willful [U. S. v. Britton, 107 U. S. 655, 666, 2 S. Ct. 512, 27 L. Ed. 520; U. S. v. Steinman, 172 F. 913, 915 (C. C. A. 3)] as distinguished from ordinary maladministration. U. S. v. Northway, 120 U. S. 327, 332, 7 S. Ct. 580, 30 L. Ed. 664; Cooper v. U. S., 13 F.(2d) 16, 18 (C. C. A. 4). It will not serve to say that the money was restored to the bank from the proceeds of the sale of mortgage participations of the pension fund. Assuming that it was returned its restoration might mitigate appellant's offense but would not nullify nor excuse it. Robinson v. U. S., 30 F.(2d) 25, 27 (C. C. A. 6); U. S. v. Jenks, 264 F. 697, 699 (D. C.).

■ There is likewise substantial evidence that the book entry upon which the second count of the indictment was based was false. The pension fund did not buy any genuine note of the "C. H. Force Syn. $23,850.00." There was no syndicate. Appellant himself testified "that the syndicate had not been completed."

Herring, a special investigating agent of the Department of Justice, testified that appellant said to him in substance: "That in the fall of 1931 the stock, after the Spira transaction, began to drop very fast and they didn't have a chance to complete the transaction, have the syndicate agreement signed prior to the completion of that syndicate. Therefore the stock purchased for the syndicate they just held the stock as collateral to Force's notes in the trust department of the bank. That in July, 1932, they knew that this stock was being carried along as collateral to Force's notes and in order *to relieve that situation* they took it up with the pension fund trustees and the pension fund trustees decided to take over that stock and to cancel the Force notes. * * *" (Italics ours.)

The recital complained of does not report a genuine transaction excusable if it was nothing more than indiscreet and ill-advised as in the cases of Hayes v. U. S., 169 F. 101 (C. C. A. 8); and U. S. v. Young, 128 F. 111 (D. C.). See, also, Twining v. U. S., 141 F. 41 (C. C. A. 3). It clearly reflects a sham or pretext upon which an apparently true but really false entry could be based. U. S. v. Darby, 289 U. S. 224, 53 S. Ct. 573, 77 L. Ed. 1137; Coffin v. U.

S., 162 U. S. 664, 685, 16 S. Ct. 943, 40 L. Ed. 1109; Morse v. U. S., 174 F. 539, 552, 20 Ann. Cas. 938 (C. C. A. 2).

It is urged that the evidence fails to show the criminal intent necessary to sustain either count of the Spira transaction. The point is without merit. There is always an inference that one intends the natural consequences of his deliberate acts. While this inference is not conclusive, it is sufficient to require the case to be decided by a jury unless it disappears in the light of other evidence which creates a reasonable doubt of appellant's guilt. Agnew v. U. S., 165 U. S. 36, 50, 17 S. Ct. 235, 41 L. Ed. 624; Robinson v. U. S., 30 F.(2d) 25, 27 (C. C. A. 6); Morse v. U. S., supra, 174 F. 539, page 554, 20 Ann. Cas. 938); see also Laws v. U. S., 66 F.(2d) 870, 872 (C. C. A. 10). As indicated above, we are of opinion that the evidence raises no such doubt as a matter of law.

The jury was justified in believing that appellant intended gratuitously to extend the credit of the bank to the prospective purchasers of the Spira stock. Granting that the pension fund was under separate and distinct control and management, the fact remains that the bank was heavily interested in it as a deposit. The jury was justified in believing that appellant caused the false entry to be recorded to protect the credit of the prospective purchasers of the Spira stock until such time as a rise in the market might make it profitable to close out the transaction, or, in the alternative, to relieve them altogether and shift the loss directly to the pension fund and indirectly to the bank itself as actually occurred; and that the entry was intended and calculated to deceive any officer of the bank who should inquire into the true nature of the transaction, or any agent of the Comptroller who should examine it.

What has been said with reference to the "misapplication" and "false entry" counts based upon the Spira transaction is illustrative of our views upon all other relative counts of the indictment and no further detailed discussion is required.

From what has been said it follows that there was no prejudicial error in failing to submit appellant's requests Nos. 2 and 6 to the jury; or in the court's amendment to request No. 3, which was in substance that if the bank paid checks issued by appellant with intent to defraud it was not open to him to say that the assets were not depleted;

or in submitting to the jury the question whether the entire transactions connected with the Force notes were shams and pretenses; nor in instructing the jury that if it found that appellant intended to sell the stock to the pension fund if it went down in value, the jury would be justified in finding that appellant had a guilty intent.

The judgment of the District Court is affirmed.