### RAKES v. UNITED STATES.
### No. 5718.

Circuit Court of Appeals. Fourth Circuit.
July 2, 1948.

Writ of Certiorari Denied Oct. 11, 1948.
See 69 S.Ct. 51.

See also 74 F.Supp. 645.

J. B. Morgan, of Leesburg, Va., and R. H. McNeill, of Washington, D. C. (McNeill & Fuller and T. Bruce Fuller, all of Washington, D. C., on the brief), for appellant.

George R. Humrickhouse, U. S. Atty., of Richmond, Va. (Robert N. Pollard, Jr., Asst. U. S. Atty., of Richmond, Va., and Carol D. Hendrick, Asst. U. S. Atty., of Charlottesville, Va., on the brief), for appellee.

Before PARKER and DOBIE, Circuit Judges, and PRETTYMAN, Associate Justice, U. S. Court of Appeals for the District of Columbia.

PRETTYMAN, Associate Justice.

Appellant was indicted, tried by a jury, and convicted upon charges of aiding and abetting one Gardner in the willful misapplication of funds of The Farmers and Merchants State Bank of Fredericksburg, Virginia, Incorporated, in violation of Section 592 of Title 12 of the United States Code Annotated.[1] Gardner was indicted in twenty counts relating to twenty transactions. Appellant was charged as aiding and abetting in thirteen of those transactions. Eight other persons were also charged as aiding and abetting, some in some counts and some in others. Severance was ordered and appellant and his wife, who was charged as an aider and abettor in ten of the counts, were tried together. She was acquitted, and he was convicted on all thirteen counts.

[1] "Any officer, director, agent, or employee * * * of any insured bank as defined in subsection (c) of section 264 of this title, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of such * * * insured bank, * * * with intent in any case to injure or defraud such * * * insured bank, * * * and every person who, with like intent, aids or abets any officer, director, agent, employee, or receiver in any violation of this section shall be deemed guilty of a misdemeanor."

The evidence presented upon the trial related to the several transactions in the most minute detail. The substance of the charges, and of the Government's proof, was as follows:

Appellant was a wealthy dairy farmer. Gardner was executive vice president of the Fredericksburg Bank. Appellant drew checks in large amounts on the bank, although he had little or no funds there. He cashed those checks at, or deposited them in, various banking institutions. When, in the regular course of the banking business, the checks reached the Fredericksburg bank, Gardner ordered them paid, or honored, although he well knew that appellant had little or no funds there and that such payment must be from other funds of the bank. This is the misapplication charged in the indictment. The thirteen counts related to nineteen such checks. of appellant amounting to about two hundred forty thousand dollars.

As the above-described checks were presented to the bank for payment, appellant, to keep his account in apparent order, deposited checks drawn by him on other banks in which he had little or no funds; he then deposited in those banks checks on still other banks in which he had little or no funds. Thus he was said to have engaged in a round-and-round check-kiting scheme over a period of months. Gardner was alleged to have known the true state of appellant's various bank accounts. It was further shown that from time to time in this process, the accumulation of check-drawing on non-existent funds caused appellant, with Gardner's assent, to balance his account with the proceeds of forged notes. The evidence showed that the total entered as deposits in the various banks under appellant's plan was $14,775,706.01.

In explanation of this otherwise strange course of action, the evidence showed that appellant purchased real estate with the cash obtained from the bank; that having thus acquired equities in property valued at approximately $1,615,000, appellant secured a loan of $1,000,000 from a life insurance company and from the proceeds of this loan paid off his debts and balanced his bank accounts. The evidence, more-over, disclosed that Gardner, in addition to being an officer of the bank, was also an agent for the insurance company and received substantial commissions on the loan; that appellant paid Gardner and others $50,000 as brokerage fees for obtaining the loan. Thereafter appellant continued to buy more real estate with money obtained from the bank by the above-described plan until his total properties were appraised at $2,274,000. He arranged through Gardner and others for a second loan of about $750,-000 from the insurance company, and again Gardner was to receive a large commission upon the anticipated loan.

Then a bank examiner discovered irregularities in the Fredericksburg Bank, and the Federal Deposit Insurance Corporation entered upon an investigation. The Bureau of Internal Revenue threatened to levy a lien of $1,780,000 for income taxes upon appellant, and, as a consequence, the insurance company withdrew from the proposed loan. The scheme of operation by appellant and Gardner thereupon collapsed and the bank failed.

The gist of the Government's charge and proof is that Gardner financed appellant's real estate operations with funds of the bank without security, and that appellant aided and abetted him in doing so.

Upon this appeal appellant presents ten points, which he groups under eight headings.

1. Appellant says that the trial court erred in failing to instruct the jury that all the checks described in the indictment were paid when presented to the banks upon which they were drawn, such payment being from deposits legally credited to appellant, and that therefore the moneys paid to him by the Fredericksburg Bank were not "wholly lost" to it as the indictment charged.

The deposits to which appellant refers were of checks upon non-existent funds in other banks, or of cash procured upon such checks, in the kiting scheme we have described. Proof was presented that Gardner and appellant knew full well what was being done, and the verdict indicates that the jury believed that to be so. The evi-

dence was that Gardner and appellant knew that the balancing deposits in the bank were without substance. The gist of the charge is that Gardner paid out funds of the bank, fully conscious that the deposits from which he was honoring appellant's checks were spurious. The checks on other banks which constituted the credits to the account were not "paid" in any actual sense, but merely passed around in the complicated maze of the kiting operations. So far as the point of law thus presented is concerned, it is clear that a bank officer cannot fulfill his fiduciary obligations by mere empty technicalities, much less by known fictions; and he who aids and abets him in the sham is equally guilty.

The core of appellant's argument on this point is that a permanent loss to the bank is requisite to the offense described by the statute. But quite apart from the fact that these transactions resulted in the failure of the bank, it is well-established law that permanent loss is no part of offenses such as embezzlement, larceny or misappropriation; neither is it an element of criminal misapplication under this statute.[2] Restitution is no defense to such offenses. The misapplication in the present case was known by Gardner and by appellant to be pregnant with the disaster which ultimately ensued. That so natural a result might have been prevented does not eradicate the act of conception.

Appellant says that the losses of the bank were due to uncollectible loans and not to the check-kiting. But the check-kiting resulted in the loans, part of them on notes alleged, and sought to be proved, by the Government to have been forged by appellant. Whether the checks were the immediate cause or not is immaterial; that they were the effective cause is decisive.

Appellant insists that the indictment charges that the funds were "wholly lost"

to the bank, and this means permanent loss of ownership. But the indictment merely says that possession, control and use were wholly lost. The proof amply supported that charge.

■ 2. Appellant says, in three related points, that the indictment was invalid because of duplicity of charges and misjoinder of parties. The face of the indictment shows that there was no duplicity of charges; each count related to a different transaction.

Appellant's argument on the point is that the several charges could not validly be joined in a single indictment. Rule 8(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., following section 687, provides that two or more offenses may be charged in the same indictment in separate counts if the offenses "are of the same or similar character or are based on * * * two or more acts or transactions connected together or constituting parts of a common scheme or plan". The Rule was substantially a restatement of existing and familiar law.[3] Its meaning was exhaustively discussed by this Court recently in Cataneo v. United States, 4 Cir., 167 F.2d 820. The applicability of the established principles to the present case is sufficiently demonstrated by the brief statement of the facts which we have made. The several offenses charged in this indictment were not only similar but were based on transactions constituting parts of a common plan, clear upon the face of the indictment; all the counts relate to the appellant's elaborate check-kiting scheme.

■ Appellant claims error in the joinder with him of others as aiders and abettors. The severance, by virtue of which he stood trial with his wife as his only co-defendant, is a sufficient answer to his claim of prejudice in this respect.[4] These other persons, moreover, were alleged to have taken part in the same check-

2 Mulloney v. United States, 1 Cir., 1935, 79 F.2d 566; Hoss v. United States, 8 Cir., 1916, 232 F. 328; Savitt v. United States, 3 Cir., 1932, 59 F.2d 541; House v. United States, 6 Cir., 78 F.2d 296, certiorari denied 296 U.S. 608, 56 S.Ct. 125, 80 L.Ed. 431; United States v. Morse, C.C., 161 F. 429; Robinson v. United States, 6 Cir., 1929, 30 F.2d 25. Cooper v. United States, 4 Cir., 13 F.2d 16, is not to the contrary.

3 See Advisory Committee's note to Rule 8(a), Federal Rules of Criminal Procedure.

4 Under Rule 14 of the Federal Rules of Criminal Procedure the trial court may grant severance "if it appears that a defendant or the government is prejudiced

kiting scheme (and mostly in connection with the same checks) in which appellant was alleged to have been engaged. They were officers of the various banks and signers in various capacities on the checks or notes which made up the operation. If a person knowingly aids and abets, in conjunction with various others, in some of a series of related transactions, he can hardly be heard to complain if he is charged in company with his fellow participants. The ends of justice are not served in such a case by a multiplicity of separate indictments for each participant and each transaction. Rule 8(b) of the Criminal Rules aptly states the law applicable before its adoption:[5]

"Two or more defendants may be charged in the same indictment or information if they are alleged to have participated * * * in the same series of acts or transactions constituting an offense or offenses."

Such procedure not only increases the speed and efficiency of the administration of justice but also serves to give the jury a complete over-all view of the whole scheme and helps them to see how each piece fits into the pattern.[6]

3. Appellant contends that the trial court erred in denying his motion for the return to him of property allegedly seized by agents of the government and for suppression of the evidence obtained by the alleged seizure. The property consisted of documents relating to the bank transactions which were the basis of the charges in the indictment. He says that the Fifth Amendment is the premise for his argument upon the point. In fact, however, he also posits an unreasonable search and seizure violative of the Fourth Amendment.

The trial court took testimony upon the motion. The Government agent testified that appellant had expressed a willingness to assemble and furnish to the investigators all personal records relating to the transactions under inquiry, and later promised to take the documents to Fredericksburg on a certain day. Appellant's wife did take them there, pursuant to appellant's instructions, and delivered them from her car to the agents on the public street.

Appellant's wife testified that pursuant to her husband's instructions she took the documents in her car to Fredericksburg, but she insisted that she repeatedly refused to give them to the agents, telling them to await her husband's arrival. At first she merely testified that she finally yielded to the numerous and insistent telephone calls from the agent and, as a result, went out from the hotel to her parked car and delivered the box of papers to the agents. Later, in response to a leading question by her counsel, she said that " * * * during one of the telephone calls he (the agent) told me, or reminded me, that the Government, or they, being members of the Government, had ways to get whatever records or documents or whatever I had that they should need." It is from the latter statement that appellant attempts to fashion an unreasonable search and seizure and compulsory testimony in violation of his constitutional rights. Nobody denies appellant's preliminary arrangement with the agent, or the delivery of the papers by appellant's wife in apparent compliance with that wholly voluntary arrangement. We find no legal point to decide since there was in fact no search, no seizure and no compulsion.

4. Appellant says that the evidence was so technical and confused that it was impossible for a jury to render an unbiased verdict. When a person participates in a devious scheme of fraud involving complicated maneuvers in modern business, he can hardly be heard to complain that the proof of his guilt is complex. The Government, as we have said, submitted its evidence in this case with mathematical precision and finality. That it did so, instead of relying upon generalities, was more to appellant's advantage than to his disadvantage.

---

by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together".

[5] See Advisory Committee's note to Rule 8(b), Federal Rules of Criminal Procedure.

[6] See Cataneo v. United States, 4 Cir., 167 F.2d 820; Gormley v. United States, 4 Cir., 167 F.2d 454.

Appellant says that many documents, such as checks, bank statements and notes, other than the checks specifically mentioned in the counts in which he was charged, were erroneously admitted in evidence. But both intent and result were elements of the offenses charged, and proof of those elements lay in many documents and events other than the checks which constituted actual parts of the misapplication of funds. Appellant contends particularly that the introduction of the forged notes was error because the forgeries were offenses not charged in this indictment. But the notes and the forgeries were proof of the intent and result of the misapplication charged. Appellant vigorously objects to the admonition of the trial court to the jury that this evidence must be considered only in relation to the intent in the transactions charged and not as evidence of other offenses. We think the admonition was not only proper but was required. In the portions of the record to which our attention is directed, all the disputed evidence related directly to plan, intent and result. We find no error in its admission.[7]

5. Appellant says that the trial court erred in refusing to grant a new trial when two petitions, signed by seven and four jurors, respectively, were presented to it some time after the trial. The seven jurors were shown to have said that they had had serious doubts at all times as to the guilt of appellant but yielded to arguments by other jurors; that if they had known that other defendants named in the indictment would be found not guilty by the court, they would never have agreed to a verdict of guilty as to appellant. The four jurors said that they had believed throughout that appellant did not understand the meaning of his acts. It is indicated that the latter four jurors were among the former seven.

In the first place, it is beyond doubt a settled rule that jurors in the federal courts will not be heard "for the purpose of impeaching the verdict returned where the facts sought to be shown are such that they essentially inhere in the verdict."[8] In the second place, if these jurors had done what they are represented as saying they would have done (that is, voted this appellant not guilty merely because other defendants in other cases were found not guilty) they would have been guilty of gross violation of their duty. They were sworn to reach a verdict upon the evidence before them as to this appellant in this case. The evidence as to other defendants in other cases may have been wholly different, as the acts of those defendants may have been wholly different from those of this appellant. He was guilty or innocent entirely independently of the guilt or innocence of other persons also charged as aiders and abettors. Jurors cannot be heard to say that if they had had certain information they would have violated their obligations as jurors. The remainder of the petitions as urged upon us now is merely a recitation that the jurors did not understand or would have ignored the clear instructions of the court. The trial court passed upon the motion and properly denied it.

We are impelled to add a further word upon this matter. The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified rule requires that if a person, whether on the jury or not, knows of such outside influence, or an attempt at it, he must at once report his information to the court. The same rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit that potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of

[7] Duvall v. United States, 3 Cir., 94 F. 2d 911.

[8] See Circuit Judge Bratton's excellent opinion in Young v. United States, 10 Cir., 163 F.2d 187, 188, and cases therein cited; Jordon v. United States, 66 App.D.C., 309, 87 F.2d 64, certiorari denied 303 U.S. 654, 58 S.Ct. 762, 82 L. Ed. 1114.

the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it.

6. Appellant says that the trial court erred in failing to grant his motions for judgment of acquittal. In this portion of his brief he relies principally upon the proposition that no evidence indicated that he knew that Gardner was causing his checks to be honored by bank drafts drawn to the Federal Reserve Bank, from which they were received in the course of business. He says that he was not familiar with the operation of banks. He says that Gardner might have declined payment and let the checks be protested.

The argument is almost frivolous. It might almost as well be said that one cannot be guilty of murder with a pistol unless he understands the physics of the explosion of the gunpowder in the cartridge. We have said enough to indicate what appellant was shown to have known. That he was not shown to have understood the precise processes by which he obtained the use of hundreds of thousands of dollars of the bank's money without security and by the manipulation of checks upon non-existent accounts, is not essential or important. By way of illustration, when he cashed checks totaling $20,000 or $25,000 against a bank balance of, say, $500 and then met their presentment by depositing checks also totaling $20,000 or $25,000 on another bank in which his balance was $1, and then met those checks by depositing others on the first bank, his knowledge of what was happening was enough, even if he did not understand the intricacies of bank clearances.

This seems a convenient place in this opinion to discuss a proposition urged vigorously by appellant generally in his brief and argument, although not presented as a separate point. In the course of his pre-sentence discussion, the trial judge said that he felt that there was no intent on the part of Gardner and appellant "eventually to take this money away from the bank"

that "they both thought they would get to pay it back"; that the income tax "broke up" the contemplated loan from the insurance company, and that appellant at all times had sufficient assets to pay what he owed. Appellant construes these remarks as establishing that he had no criminal intent, and thus that the instruction to the jury on intent was erroneous and without foundation. Of course, what the court was saying, as the entire text of its discussion shows, was that appellant had assets to meet his debts, that he and Gardner planned to cover their transactions with the proceeds of the contemplated loan, and that when the negotiations for the loan failed the whole scheme collapsed, but that all this had nothing to do with the intent to misapply the funds of the bank. The slightest thought shows the correctness of the court's position. Many embezzlers fully intend to return the money they take; if a horse wins a race, or the stock market goes up, or if next month's expenses are not so heavy. Moreover, the fact that a man has assets does not negative an intent to steal; a rich man can be guilty of theft; the question is not what he has but what he takes and how he takes it. The trial judge stated to the jury the law of intent in this matter with extreme accuracy and clarity. The instruction was too long to repeat here, but in substance it drew a sharp line between a bona fide intent to meet a check with presently available funds and an intent to meet it with funds to be derived from an expected event or transaction. He emphasized that all the circumstances must be considered in determining whether there was an intent to defraud. We find no error in his treatment of the subject.

7. Appellant says that the trial court erred in denying his motion for a change of venue. He says that upon the voir dire at least half the hundred talismen disclaimed ability to give him and his co-defendant a fair trial, that this inability was the result of widespread unfavorable and extravagant publicity, largely concerning the prior trial, and that this prejudice impregnated the whole community. No charge is made respecting the individuals

who composed the jury. This trial was in Richmond. It would take strong evidence to establish that in so large a city an impartial jury could not be found to try an offense committed in Fredericksburg, a smaller city some fifty miles away. Change of venue lies largely in the discretion of the trial court. That this discretion was not abused in the present case is shown not alone by the satisfaction of the judge upon the voir dire examination, but also by the fact that this jury acquitted appellant's co-defendant upon all counts.

8. Appellant complains of some instructions given and of the denial of some prayers for instructions. Most of these related to points already herein discussed. We have examined the ,entire charge and also the requested instructions and find no error by the court in ·either respect. We are impressed by the care—indeed the persistent care—with which the trial judge instructed the jury in so complicated a matter.

It follows from all the foregoing that the judgment must be, and it is, affirmed.